153 P.2d 670

McDONALD v. POLANSKY et al.

BLOCK et al. v. SAME.

No. 4823.

Supreme Court of New Mexico.

Nov. 22, 1944.

519

Fred E. Wilson, of Albuquerque, for appellants Block et al.

Rodey, Dickason & Sloan and Frank M. Mims, all of Albuquerque, for appellant McDonald.

Iden, Adams & Johnson and Simms, Modrall & Seymour, all of Albuquerque, for appellees.

MABRY, Justice.

We have here two suits seeking specific enforcement of an alleged oral contract or agreement to make a joint, or mutual will, the cases being consolidated for trial and appeal. Defendants contend that while the wills are written as one document and may be referred to in the discussion as "joint," or "mutual," or "joint and mutual," that each will is, in fact, complete in itself and that no attempt is made by either testator to make joint disposition of their property after the death of the survivor, and that the language of the will, or wills, moreover, bears no such interpretation; that there is neither evidence aliunde or to be found in its terms which would support the contention that a contract in this connection was ever entered into. The answers to both complaints deny that the wills were executed in pursuance of such contract or agreement, and alleged that at the time of their execution it was clearly understood and agreed between the testators that the survivor would be free at any time to make a different will and to otherwise dispose of all property left upon the death of the one. The issues were tried to the court, which held that the wills were not executed pursuant to any such contract and dismissed the complaints. Plaintiffs appeal.

The Plaintiffs in both suits were beneficiaries under the first wills and are complaining because, after the death of John B. Block, one of the testators, his widow, Anna Block, after accepting benefits under the original will or wills, made a subsequent and different will making substantially different disposition of the property left to and owned by her at the time of her death. Appellants will hereinafter be referred to as Plaintiffs and Appellees will be referred to as Defendants. No significance is to be attached to the fact that in some places, we, like counsel, might employ interchangeably the terms "will" and "wills" in reference to the first will of May, '1939.

This is not a suit to set aside an irrevocable will, if there could be such. All parties recognize that revocability is an essential element of a will (Ward v. Ward, 96 Utah 263, 85 P.2d 635; Notten v. Mensing, 3 Cal.2d 469, 45 P.2d 198; Matter of Higgins' Will, 264 N.Y. 226, 190 N.E. 417; In re Krause's Estate, 173 Wash. 1, 21 P.2d 268), but that is not to say that the courts will not enforce a contract to make a will; an action lies either at law or in equity, and relief will be granted against one who has accepted benefits and thereafter violated the agreement from which the joint will resulted. And, it is likewise not disputed that Plaintiffs, as beneficiaries, might enforce by specific performance any rights they may have had in the premises, as here attempted. Schauer v. Schauer, 43 N.M. 209, 89 P.2d 521.

Although some four points are noticed and argued under the assignments of error, Plaintiff McDonald doubtless correctly appraises the issues presented when she says, in her brief, the only question raised by this appeal is as to the sufficiency of the evidence to support the court's finding that the first will of Anna Block was not executed pursuant to an oral contract or agreement. There seems to be no dispute as to whether the trial court was entitled to consider evidence going to the matter of an oral contract aliunde the terms of, and expressions found in, the will itself. All parties introduced and relied upon such evidence in this connection.

John B. Block and Anna Block, an aged and childless couple, owned considerable property in New Mexico, accumulated during a long married life. On May 12, 1939, they executed mutual wills, embodied in one instrument, by the terms of which the estate of the one first to die would go to the survivor, and upon the death of such survivor, his or her estate was to go to certain beneficiaries, among whom were the Plaintiffs. John B. Block died May 29, 1939, and this, his will, was duly probated as his last will and testament. Anna Block, being the sole legatee of his estate, received all of such estate after the payment of claims and expenses of the administration. Then, on August 7, 1939, Anna Block executed a new will which purported to revoke all previous wills made by her, and which materially reduced the bequests and devises to the Plaintiffs as provided for under the will of May, 1939.

Anna Block died on June 25, 1942, and her will of August 7, 1939, was duly admitted to probate and her estate is now in the course of administration under that will. These suits are by the Plaintiffs as beneficiaries under the joint will to enforce the alleged oral contract or agreement which it is claimed resulted in the execution of the alleged joint will, and to impress a trust in favor of Plaintiffs upon the property of the estate of Anna Block, deceased.

Since the trial court found adversely to plaintiffs on all issues and as to all the conflicting evidence offered on their behalf, the burden rests upon them to show lack of support in the evidence for such findings. Conflicts in the evidence must be resolved in favor of the party prevailing and the evidence in general must be construed in its aspect most favorable to them. No authority need be cited in support of this well established principle.

The will (or wills), as one instrument, and the provisions in it, may be, for convenience, set out under subdivisions to be designated as First, Second, Third, and Fourth. The will ends with the usual paragraph, as follows: "In witness whereof, the said John B. Block and said Anna Block have subscribed their names hereto this the 12th day of May, A.D., 1939, at Albuquerque, Bernalillo County, New Mexico."

Under that part of the will designated as First, and divided into subparagraphs (A), (B), (C) and (D), John B. Block devises and bequeaths unto his wife, Anna Block (should she survive him), all the estate, real and personal and mixed, wherever situated, of which he may die seized or possessed, or may be entitled to at his death. All such property shall belong to her absolutely. He then appoints Anna Block as sole executrix of his will in subparagraph (C).

In the following paragraphs, under letter (D), the will provides that in case said John B. Block shall survive the said Anna Block, "he does hereby will, devise and bequeath all of his estate as hereinafter mentioned in the following manner." Then follow eight specific bequests and devises to eight designated beneficiaries, the last paragraph 8 (Tr. 7) containing a residuary clause in which the Plaintiffs, James Marshall Block, his wife, Mrs. Virginia Olsen Block, and their son, John Bingham Block, II, are made the residuary legatees of seventy-five per cent of his estate, and Ernest A. Polansky twenty-five per cent.

In the last subparagraph under First he names Mary Valverde McDonald, Ernest A. Polansky and James Marshall Block as executors, "the said Anna Block, who was appointed in paragraph (C), having failed to survive him."

Under that portion of the will designated Second, there are identical provisions made by Anna Block with those made in the first part of the will by John B. Block. In other words, she gives, devises and bequeaths unto her husband, John B. Block (should he survive her), all her estate, etc., in identical language, and it is provided that all such property shall belong to him absolutely. In subparagraph (D) of paragraph Second Anna Block makes specific bequests and devises to the same eight beneficiaries, in identical language as those named in that portion of the will under paragraph First.

That part of the will under the division Third is common to both testators and deals with the possibility that their deaths should occur simultaneously or under circumstances causing doubt as to which survived the other. In that event, both having died, the entire estate devolves to the beneficiaries named under paragraph (D) part First, and paragraph (D) part Second, or in other words, to the eight beneficiaries named by both.

In that part of the will under the division Fourth the language becomes applicable again to both testators, conferring certain powers and authority on the executor or executors.

We have carefully examined the testimony touching upon the preparation of and the execution of the first will, or wills. In substance, we have the following facts upon which the trial court could, and did, rely in finding that there was no contract or agreement to make joint, or mutual, wills, jointly directing disposition of the

property after the death of the survivor, but which would, rather, support defendants' contention that it was clearly understood no such agreement was ever had and that either party could, at his election, change his will:

Ernest A. Polansky, an attorney at law, of Albuquerque, testified as to the facts and circumstances leading up to the execution of the will in question. He had done legal work for Mr. and Mrs. Block for many years prior to their deaths. Mr. Block called for him and he went to the home of the parties two or three days prior to the time the will was actually executed to discuss the matter. Mr. Block told Polansky what was to go in the will, Polansky then making pencil notations in order to prepare the will in accordance with the instructions. After Polansky returned to his office, he made an investigation of the law relative to so-called joint and mutual wills and decided that the case of Beveridge v. Bailey, 53 S.D. 98, 220 N.W. 462, reported in 60 A.L.R. 619, covered what Mr. Block had in mind and he used the will involved in that case as a single instrument pattern; and he was, at all times, undertaking to have it come within the rule there applied. Polansky first prepared a rough draft of the will and it was apparently at this time that Mrs. Block' went over its terms. He then took this draft back to his office, prepared the document in final form and took it to the Block residence. Both Mr. and Mrs. Block were at home when he gave the will to Mrs. Block and she read it. At this point, Polansky testified as follows:

"Q. What remark, if any, did she make when she read it? A. She said right off she wanted to know if she would have the right to change the will, if she didn't she would not sign that will.

"Q. State as near as you can in the exact language, what Mrs. Block stated to Mr. Block in your presence about the will before it was signed. A. She said, after she read the will, she said 'Now, if Mr. Block dies do I have the right to fix up another will?' And Mr. Block said, 'Yes, Anna, you do and I have that same right.' She asked that to him, then there was nothing more she said and she went back and read it again and then took her glasses down and said, 'Now, Mr. Polansky, are you sure that I can change this will if I want to, I can make disposition if I want to?' And Mr. Block said again, 'Anna, yes, and I have that same right too.' And then she even hesitated, and read it again and again; and I didn't think she was going to sign.

"Q. Did she sign? A. After she hesitated she asked me twice whether I was sure that if he died first she got the property.

"Q. What did you tell her? A. I had never dealt with her much. She appeared to hesitate and I had a feeling she doubted me."

The testimony shows further that Polansky made it clear to Mrs. Block that he

prepared the will with the understanding that either could change it. He even offered to take the will back to his office and re-write it so that it would show plainly that either one could thereafter change. That seemed not to be necessary when Mrs. Block became satisfied that such changes could be made. A neighbor, one Mrs. Kiefer, was then called in and Mr. Block explained to her that she was wanted as a witness but that his wife wanted first to be assured that there was no restriction upon her changing the will, that if he died first and she got the property "it would be hers to dispose of as she saw fit." The will was then signed by both parties thereto. The testimony of Mrs. Kiefer amply supports that of Mr. Polansky.

It further appears that one of the reasons impelling the making of a joint will may have been to assure appropriate disposition of the property as both then desired it, in case both the husband and wife should die at the same time, as in a common disaster. Mr. Block told Polansky that he wanted it fixed so that either party could make a change; so that "They could make it or not, but wouldn't have to make it." There is other testimony, slightly contrary, going to support the contention of defendants which need not be set out here. It is thus seen there is substantial evidence to support the court's finding that the will as executed was not based upon and did not grow out of, any oral contract or agreement to make such wills.

We see no merit to the contention that the testimony of Polansky should be considered merely as his interpretation of the *effect* of the will, and not as reflecting the existence or non-existence of a previous oral contract to make such mutual, or reciprocal, wills. Some of the testimony of Polansky doubtless went to his interpretation of its legal effect; but, the interpretation was called for when he was asked to prepare a will which either, as survivor, could change, and when he was later, and at the time of the signing, called upon to explain the legal effect to each of the testators—to assure Mrs. Block that this result had been achieved. Much of Polansky's testimony went to the question of what transpired, what was said by and between the two testators, at the time of signing, all affording substantial support to the finding that there was no such oral contract as Plaintiffs contend for, and to the conclusion that neither party desired to have their hands tied in this respect.

█ Evidence appears in the record in support of the contention of Plaintiffs that Mrs. Block might have felt that she was bound by an understanding or agreement with her husband to leave the disposition made in the early will undisturbed and that, therefore, she would violate such understanding if she should make another second will; but this is contradicted by other evidence to be relied upon in support of the trial court's finding to the contrary, and by which we are bound.

One of the Plaintiffs seems to contend that the evidence upon which the trial court relied in making its finding that there was no oral agreement to make joint or mutual wills, if examined closely, will disclose that it offers support, not for that finding, but if for anything, it would support a finding only that after the oral agreement to make mutual wills so disposing of the property and after the wills were made, there was then added an additional element, or matter, to the oral agreement, viz., that the survivor should have the right to change and not be bound by the agreement theretofore made. Whether such a case, if present, would support a different result, we do not pause to consider. It is enough to say that there is evidence to support the trial court's finding that there was never any contract or agreement of any kind to make mutual wills.

Counsel for all Plaintiffs have filed exhaustive briefs and have ably presented their contention in oral argument, but we are constrained to hold that none of the authorities relied upon by them, and touching the controlling question, persuade us that their position is sound. It is true that under many circumstances the very language of the wills themselves so jointly executed will support a construction that they resulted from a previous contract, an irrevocable agreement, to jointly make such disposition. Some of the cases cited and relied upon by Plaintiffs are: Frazier v. Patterson, 243 Ill. 80, 90 N.E. 216, 27 L.R.A.,N.S., 508, 17 Ann.Cas. 1003; Seat v. Seat, 172 Tenn. 618, 113 S.W.2d 751; Campbell v. Dunkelberger, 172 Iowa 385, 153 N.W. 56; Baker v. Syfritt, 147 Iowa 49, 125 N.W. 998; Sherman v. Goodson's Heirs, Tex.Civ.App., 219 S.W. 839; Lewis v. Lewis, 104 Kan. 269, 178 P. 421.

But in all of these cases we find a clear directive, or, language is employed, which would have to be construed as definitely defining the beneficiaries to take *after* the death of the *survivor*, and "jointly" directing disposition, which, of course, presents a different problem. For example: "After the death of the *survivor* of us, as aforesaid, it is *our* wish that the property * * * should become the property of * * *" (emphasis ours), reads the will in Baker v. Syfritt, supra [147 Iowa 49, 125 N.W. 999]. The will here in question attempts to make *individual* disposition of the property after the death of the survivor, as distinguished from a case where there is an attempt to *jointly* direct a disposition of the property after the death of both, as in Frazier v. Patterson, supra. See the collection of authorities under 43 A. L.R. 1020, 57 A.L.R. 607, 60 A.L.R. 627, 102 A.L.R. 491 relating generally to the construction of so-called joint and mutual wills.

It need not be concluded that it was a mere coincidence that each of the testators made identical disposition of the property to be left, in case neither survived the other, to support the trial court's view.

It could just as well have been, as the evidence tends to show, that at the time of the making of the mutual wills, both Mr. and Mrs. Block were willing, without other consideration, that in case they should die in a common disaster as they viewed the matter then, that the beneficiaries named should be the recipients of their bounty. That does not mean that under other circumstances, either would be bound— that either could not thereafter change his mind. It would seem that if at the time of the preparation and the signing of the wills, when the parties were now finally called upon to express their understanding and intention, a time when, certainly, if there had been a previous contract or agreement between them to make a will *jointly* disposing of their property, this would have appeared from the discussion. But, the very contrary appears to be the understanding. The appraisal both parties placed upon the meaning and effect of the completed document becomes important. Each then and there stated, and agreed, that it was not the intention that different disposition could not thereafter be made by the survivor.

· There has been some criticism of the policy of enforcing contracts to make wills (In re Fischer's Estate, 196 Wash. 41, 81 P.2d 836) and yet, in spite of such misgivings, their validity is now quite generally conceded. However, we take from Page on Wills, (Vol. 4, Chap. 53, page 829, Lifetime Ed.), supported by authority therein cited, the following statement:

"While contracts to make wills are enforceable they are not favored by the courts. The requirements with reference to certainty, burden of proof and, in some states, special restrictions as to the time at which such contract takes effect, or as to the amount of damages which may be recovered in case of breach, make such a contract very difficult to prove and to enforce; and in case it is proved, seem to treat it as a basis for recovery in quasi-contracts rather than as a contract in the proper sense of the term."

We do not pause to distinguish between "joint," "reciprocal," or "joint and mutual" wills, since the differences, not distinguished by many authorities in any event, are not important here. This instrument is not, by express terms, designated as any one of these. Obviously the wills are "jointly executed," and they may have resulted from "mutual desires." They dispose of what is substantially the community property of the two testators, Block and wife, at least one-half of which the husband could not himself so dispose of in any event.

The case of Beveridge v. Bailey, 53 S.D. 98, 220 N.W. 462, 466, 60 A.L.R. 619, the case examined and relied upon at the time by the attorney who prepared the will in the case at bar, might be noticed at this point. There the court said:

"The controlling question before us is, Do the jointly executed wills in this case establish a contract to dispose of property by will in the manner contended for by

respondent? As said before, the instrument relied upon is not in the strict sense a joint will, but is in reality one writing containing two mutual wills. The New Jersey court, in Deseumeur v. Rondel, 76 N.J.Eq. 394, 74 A. 703, says: 'A testamentary disposition contained in one writing and disposing of property held jointly is, I presume, precisely referred to as a "joint will"; whereas, the same document, if it refers to and deals with property held separately, would probably be more precisely termed a "mutual will." ' "

"If we enlarge this definition to include separately owned property mentioned for the purpose of making a joint testamentary disposition of it, still the will of the McKinneys does not fall within the definition of a joint will. Considered as mutual wills, it may fairly be inferred that there was an agreement between the parties to make them in one instrument, but that is about all of the contract that is disclosed. If there was anything more, it is not disclosed. Each is complete in itself, and couched in language common to individual wills generally. Dennis gives to his wife his property in case she survives him, with alternative provisions in case she does not. No one would contend that, if his will stood alone, the alternative provisions evidenced an agreement with the wife to make the same disposition if she should survive him. Emma gave all her property to her husband, in the event that he survived her, with alternative provisions, in the event that he died first. The fact that the alternative provisions in her will were the same as in his may indicate some agreement as to the matter, but it does not indicate what the agreement was. If there was an agreement, the reciprocal devises one to the other might supply the consideration, but not the contract. * * *"

And, we take the following language from the opinion in the above case upon rehearing. 53 S.D. 382, 220 N.W. 868, 60 A.L.R. 619. It is there said:

"It is claimed that we must have overlooked the fact that a large part of the property willed to respondent was jointly owned by the McKinneys at the time the will was made. It is then vigorously argued that that fact is sufficient to show a joint will, and to establish a contract in favor of respondent. We did not overlook the fact, but did not consider it necessary to mention it in the opinion, except as it appeared in the will set out. Neither do we now think it important. * * * No property, whether owned jointly or severally, was attempted to be given by both to respondent or any one after the death of both. * * *"

"Our opinion stressed the need of some language to evidence the intent, and we pointed out, as we thought, clearly, that the language in the opinions relied upon by respondent as evidence of the contract was a *joint* disposition of the property effective *after the death of the survivor*. Nowhere in the joint mutual wills of the McKinneys are there any words in

any way jointly directing a disposition of the property after the death of the survivor, but each acts separately, and leaves the final disposition wholly to the individual will of the survivor. * * * We cannot establish a contract on a guess. If they wanted to bind each other to their respective wills as written, they should have indicated it in some appropriate manner."

Plaintiffs complain that the trial court apparently mistakenly took the view that in order for the jointly executed will to be binding there must be, not an agreement to make a joint will, but rather one not to change it. We do not agree that such view was taken. A contract to make such will, the trial court correctly held, must first be established, and that this was not established. "A contract to make a will must, in order to be enforceable, 'be clearly proved and be certain and unambiguous in all its terms.'" 4 Page on Wills (Lifetime Ed.) Sec. 1711, citing cases from some fifteen states and the Federal courts.

Other questions raised and argued by Plaintiffs are controlled by what we have said and held relative to there being substantial evidence to support the findings upon the principal issue, and they need not be noticed.

Finding no error, the judgment is affirmed.

SADLER, C. J., and BICKLEY, BRICE, and THREET, JJ., concur.